1  DAVID A. LOWE (SBN: 178811)
   dal@rezlaw.com
2  MICHELLE G. LEE (SBN: 266167)
   mgl@rezlaw.com
3  ZOË R. DEGEER (SBN: 298698)
   zrd@rezlaw.com
4  RUDY, EXELROD, ZIEFF & LOWE, LLP
5  351 California Street, Suite 700
   San Francisco, CA  94104
6  Telephone: (415) 434-9800
   Facsimile: (415) 434-0513
7

8  *Attorneys for Plaintiff*
   ESTELLE MCGECHIE
9

10              UNITED STATES DISTRICT COURT

11             EASTERN DISTRICT OF CALIFORNIA

12

13  ESTELLE MCGECHIE,                    Case No. 2:22-cv-01812-TLN-DB

14          Plaintiff,                   **FIRST AMENDED COMPLAINT FOR DAMAGES**

15      vs.                              **DEMAND FOR JURY TRIAL**

16  ATOMOS LIMITED, ATOMOS, INC., and
    DOES 1 through 20, inclusive,
17

18          Defendants.

19

20  _____/

21

22

23

24

25

26

27

28

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1 | ESTELLE MCGECHIE, complains and alleges as follows:

2 | **NATURE OF THE CASE**

3 | 1.      Plaintiff Estelle McGechie ("Plaintiff or "Ms. McGechie") was the Chief

4 | Executive Officer of Atomos Limited.  She dared to speak up about rampant illegal conduct at

5 | Atomos and she suffered the consequences.  Following Ms. McGechie's investigation into and

6 | reports about Atomos' securities fraud and revenue manipulation, including falsely reporting

7 | material sales forecast information to shareholders, "channel stuffing" (shipping excessive

8 | product to distributors to prematurely record sales and fraudulently inflate revenue), knowingly

9 | shipping defective and inoperable merchandise to prematurely record sales, and insider trading,

10 | Atomos terminated her.

11 | 2.      Atomos recruited Ms. McGechie based on her prestigious career, her unique

12 | product and domain experience, and her work with leading film studios and broadcasters.

13 | Although Ms. McGechie was a high-performing executive who was working to turn the

14 | organization around, her male colleagues were resistant to her pleas to bring the company into

15 | compliance.  This attitude toward Ms. McGechie was indicative of the insidious "boys' club"

16 | culture at the company.  Indeed, Ms. McGechie was the only female leader at Atomos.  While

17 | men are frequently touted and supported despite their relative lack of experience and

18 | inappropriate conduct, she was micromanaged, more harshly criticized for her "management

19 | style," and targeted when she spoke up.  As a woman, Ms. McGechie was expected to be a

20 | subservient "yes" leader and, when she did not comply, her days were numbered.

21 | 3.      Instead of taking her complaints regarding unlawful conduct seriously, Atomos

22 | terminated Ms. McGechie to avoid addressing fraud at the company and scapegoat

23 | Ms. McGechie for the aftermath of years of illegal conduct perpetrated by its male executives.

24 | 4.      After notifying Ms. McGechie of her termination, Atomos immediately tried to

25 | rehire her, in an apparent *mea culpa*.  Atomos then terminated her again after Ms. McGechie

26 | made it clear that she would not turn a blind eye to multiple compliance issues at the company.

27 | After hearing her final complaint regarding the illegal activity, and her plans to address it,

28 | Atomos terminated her.  Atomos continued its pattern of deception to shareholders by falsifying

1

1    the reason for Ms. McGechie's termination in its public announcements and repeatedly

2    misleading shareholders regarding its financial forecast.

3            5.        Ms. McGechie brings this lawsuit to address Atomos' unlawful retaliation and

4    toxic culture of gender bias and to hold Defendants accountable for discrimination, retaliation,

5    and wrongful termination in violation of California's Fair Employment and Housing Act and the

6    California Labor Code.

7                                                **PARTIES**

8            6.        Plaintiff Estelle McGechie was employed by Atomos Limited and Atomos, Inc.

9    ("Defendants" or collectively "Atomos") from June 2021 until her termination in April 2022.

10   She also consulted for Atomos from March through May 2021.  During all relevant time periods

11   herein, Plaintiff resided and worked in Truckee, California.

12           7.        Upon information and belief, Defendant Atomos Limited is an Australian

13   company which has its headquarters in Melbourne, Australia and maintains eight offices

14   worldwide, including in the United States, Japan, China, United Kingdom, and Germany.

15   Atomos Limited primarily sells professional video monitor-recorder hardware products.  The

16   majority of Atomos Limited's worldwide sales are made in the United States.

17           8.        Upon information and belief, Defendant Atomos, Inc. is an Oregon corporation

18   and is a wholly owned subsidiary of Atomos Limited.

19           9.        The true names and capacities of Defendants named herein as Does 1 through 20,

20   whether individual, corporate, associate or otherwise, and the true involvement of Defendants

21   sued herein as Does 1 through 20, are unknown to Plaintiff who therefore sues said Defendants

22   by such fictitious names.  Plaintiff will amend this Complaint to show the true names, capacities,

23   and involvement of Does 1 through 20 when ascertained.  Plaintiff is informed and believes and

24   thereon alleges that each of the Defendants designated as a "Doe" is responsible in some manner

25   for the events and happenings referred to herein, and that Plaintiff's injuries and damages as

26   hereinafter set forth were proximately caused by said Defendants.

27   ///

28   ///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

10.     Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein is or was the agent, employee, partner and/or representative of one or more of the remaining Defendants, and each of them was at all times acting within the purpose and scope of such agency and employment.  Plaintiff is further informed and believes that each of the Defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

11.     Plaintiff is informed and believes and thereon alleges that, at all relevant times, Atomos, Inc. and Atomos Limited were the alter egos of each other and that Atomos, Inc. and Atomos Limited are an integrated enterprise.

12.     Specifically, Plaintiff alleges that, at all times herein mentioned:

a.      There existed and continues to exist a unity of interest and ownership between Defendant Atomos, Inc. and Defendant Atomos Limited such that the individuality and separateness of these Defendants have ceased to exist;

b.      Atomos, Inc.'s most recently publicly filed Articles of Amendment to its Articles of Incorporation, filed with the Oregon Secretary of State on October 9, 2019, identifies Atomos, Inc.'s Directors as Atomos Limited's Chief Financial Officer, James Cody, and Atomos Limited's former Chief Executive Officer and director, Jeromy Young, listing Atomos Limited's Melbourne headquarters as their business address;

c.      Atomos, Inc.'s most recently publicly filed Corporation/Limited Liability Company – Information Change, filed with the Oregon Secretary of State on January 10, 2020, identifies Atomos, Inc.'s President and Secretary as Jack Murphy, who holds himself out as Atomos Limited's North American General Manager and reports to Atomos Limited's Chief Financial Officer;

d.      Atomos Limited and Atomos, Inc. jointly maintain a New York office at 253 36th, 3rd Fl., Ste. B312, Brooklyn, New York 11232, from which Atomos, Inc. employees work;

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

e. Atomos, Inc.'s principal place of business is identified only as an accountant's office at 4540 SW 110th Ave., Beaverton, Oregon 97005, and its registered agent, Neil Kenneth Johannes, is a licensed tax preparer who works at that office.  No employees of Atomos, Inc. or Atomos Limited work at that location;

f. Defendant Atomos Limited controlled and directed Defendant Atomos, Inc., including the company's labor relations, payroll, business, property, and affairs;

g. Defendant Atomos, Inc. is completely owned, dominated and controlled by Defendant Atomos Limited;

h. Defendant Atomos, Inc. is a mere shell, instrumentality, or conduit for the business of Atomos Limited;

i. Defendant Atomos Limited entered into contracts with and collected funds from third parties through Atomos, Inc., for the benefit of Atomos Limited;

j. Defendants comingled and failed to segregate funds and other assets between Atomos, Inc. and Atomos Limited;

k. Defendant Atomos, Inc. is not adequately capitalized to operate a business engaged in the "development, sales, marketing and support of electronic video, film and TV";

l. Defendants did not maintain separate payroll for their employees;

m. Defendant Atomos, Inc. derives actual and significant monetary benefits by and through Atomos Limited's unlawful conduct, and by using Atomos Limited as its sole funding source;

n. Atomos, Inc. failed to comply with all requisite corporate formalities to maintain a legal and separate corporate existence, including maintaining board meeting minutes and adequate corporate records; and

///

///

o.    Adherence to the fiction of the separate corporate existence of Defendants Atomos Limited and Atomos, Inc. would, under the circumstances, sanction a fraud and promote injustice by allowing Defendants to evade liability for their debts.

## JURISDICTION AND VENUE

13.    Venue is proper in this judicial district pursuant to California Code of Civil Procedure § 395(a) and California Government Code § 12965.  Defendants entered into employment contracts with Plaintiff and contracted to perform an obligation to Plaintiff in the County of Nevada in this district.

14.    Plaintiff was employed in, and significant events material to this case occurred within, Nevada County, California.  The obligations and liability complained of herein arose in Nevada County, California, and Plaintiff suffered injury in Nevada County, California.

15.    Defendants recruited Plaintiff through meetings with Plaintiff in California. Defendants entered into employment contracts with and employed Ms. McGechie in Truckee, Nevada County, California.

16.    During her tenure with Atomos, Plaintiff met with Atomos' suppliers, developer partners, distributors, and channel partners located in California.

17.    This Court has personal jurisdiction over Defendant Atomos, Inc., as it conducts substantial business operations in California, including employing Plaintiff and other employees in California, maintaining a physical office in California, contracting with California companies, and conducting significant sales and marketing efforts in California.

18.    Defendant Atomos Limited is present in the United States through its extensive business operations, including in maintaining physical facilities and offices, retaining U.S. employees, contracting with U.S. suppliers, and conducting significant sales and marketing efforts in the U.S.

///

///

///

FIRST AMENDED COMPLAINT FOR DAMAGES

CASE NO. 2:22-CV-01812-TLN-DB

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

19.     Defendants maintain offices and facilities in the U.S.  Atomos publicly represents that it has offices in Los Angeles, California and in Brooklyn, New York.  Defendants further maintains a distribution center in New Jersey from which they ship products for processing and shipment to distributors in the U.S. and over 30 other countries in the Americas.

20.     The majority of Atomos' sales are in the U.S.  Atomos contracts with over 100 resellers in the U.S. to sell its products.  More than 35 of its major resellers and distributors are located in the U.S., including but not limited to Global Distributors, located in Glendale, California, B&H, Adorama, and Broadfield.  Further, Atomos sells its products in over 30 reseller locations in California.

21.     Atomos executives regularly traveled to California for events, as well as for meetings with distributors, channel sales companies, and suppliers, many of which are headquartered in California.

22.     Atomos applied for and received a loan from the U.S. government via the Paycheck Protection Program ("PPP"), through which the federal government provided billions of dollars to make low-interest, and in some cases forgivable, loans to companies employing workers in the U.S. in response to the COVID-19 pandemic.  Atomos reported in the PPP loan application that Atomos, Inc. is a corporation located in the U.S. and that the loan was to be used for payroll expenses.

23.     Atomos Limited directs the majority of its promotional activities to the U.S., including attendance at conferences, events, and tradeshows such as the Apple Worldwide Developer Conference (Cupertino), Final Cut Pro Global Summit (Cupertino), CineGear (Los Angeles), Hollywood Professional Association (Los Angeles), Key Code Media Post NAB Roadshow (Los Angeles), Sports Video Group Summit (Los Angeles, New York), National Association of Broadcasting Show (Los Angeles, Las Vegas, New York), and Consumer Electronic Show (Las Vegas), among others.  Atomos publicly reported that 75% of the U.S. tradeshows it participated in are located in California.  Atomos uses these tradeshows for marketing and sales as well as to hold sales meetings with U.S.-based distributors and suppliers.  The company devotes substantial time and resources to these shows, including hiring U.S.-based

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    consultants and tradespeople to build booths and displays and to create and distribute marketing

2    and promotional materials.  The Executive Team and Board members often attend to promote the

3    brand, entertain analysts, investors, and shareholders, and to build local relationships.

4        24.    Defendants employ more than twelve employees located in Los Angeles,

5    California, Brooklyn, New York, and Seattle, Washington.  In addition to employing Plaintiff,

6    Atomos employs key sales managers and a research and development team in California.

7    Plaintiff was "onboarded" to her role by Atomos' General Manager Jack Murphy in the U.S.

8        25.    Defendants are subject to the personal jurisdiction of this Court because

9    Defendants maintain extensive business operations in California, including maintaining an office

10   in California, employing a workforce of California employees, selling merchandise to over 30

11   major resellers located in California, contracting with a large distributor in California, contracting

12   with suppliers in California to provide key technology and enablement for its products, partnering

13   with developers in California, and directing substantial marketing and sales efforts to California.

14                    **PROCEDURAL ALLEGATIONS**

15       26.    On August 15, 2022 and on December 12, 2022, prior to filing this complaint, Ms.

16   McGechie filed complaints with the California Civil Rights Department (formerly known as the

17   Department of Fair Employment and Housing) against Atomos Limited and Atomos, Inc.,

18   alleging gender discrimination and retaliation, and obtained a Right-to-Sue notice the same day.

19                **FACTS COMMON TO ALL CAUSES OF ACTION**

20   A.    **Ms. McGechie's Experience in Video Production, Marketing, and Product**
21         **Development.**

22       27.    Ms. McGechie has built an impressive career in all aspects of video production,

23   including producing and editing.  Ms. McGechie is also an experienced leader in technology

24   companies and has held senior positions developing video, motion graphics, and a variety of

25   technologies including software, hardware, and cloud services at tech companies such as Apple,

26   Logitech, and Frame.io.

27       28.    Atomos first met Ms. McGechie when she was working for Apple in 2013 at in-

28   person meetings at Apple's offices in Cupertino, California.  While working on the development

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800| FX (415) 434-0513 | www.rezlaw.com

of Apple ProRes and ProRes RAW integration of Apple technology with Atomos products, she became more involved with Atomos on a regular basis.  Atomos met with Ms. McGechie several times in California, as well as by video, to persuade her to join Atomos.

29.    In March through May 2021, Ms. McGechie joined Atomos as an independent contractor.  In June 2021, following years of familiarity with Ms. McGechie's management style and skillset, Atomos hired Ms. McGechie as Chief Product Officer.  In the company's public announcement, Atomos' former CEO and Founder Jeromy Young stated, "We are very lucky to have Estelle joining Atomos …. The Silicon Valley product experience Estelle brings will complement our product team to drive growth in software revenue, generated off the back of our large hardware install base."  Atomos' Executive Chairman Chris Tait stated, "I am thrilled that we have someone of Estelle's experience joining Atomos, her breadth of knowledge, particularly in bringing leading software solutions to market, will be invaluable for us."

30.    As CPO, Ms. McGechie entered into an employment contract with Atomos, Inc. and reported to officers and directors of both Atomos, Inc. and Atomos Limited.  As CEO, Ms. McGechie entered into an employment contract with Atomos Limited and continued to report to directors of both Atomos, Inc. and Atomos Limited.  Ms. McGechie was paid solely through Atomos, Inc. throughout her employment with Atomos.  Atomos, Inc. paid Ms. McGechie her California cost of living adjustment, withheld payroll taxes, handled state disability and unemployment insurance, and paid Defendants' share of payroll taxes.  Defendants' directors and officers participated in and ratified the decision to terminate Plaintiff's employment.  Atomos, Inc. owned and supplied Plaintiff with the equipment necessary to perform her job, including reimbursing her for her home office expenses.  After her termination, she was instructed to and did ship the equipment Atomos provided her, such as her laptop, to Atomos, Inc. through Jack Murphy.  Atomos, Inc. and Atomos Limited jointly employed Ms. McGechie throughout her employment with Defendants.

**B.    Atomos' Male-Dominated "Boys' Club" Culture.**

31.    When Ms. McGechie joined Atomos as a full-time employee, she was the only woman in senior management out of eleven positions.  As of July 2021, out of 35 total middle-

level managers, only three were women.  The company's leadership is male dominated, and

gender-biased attitudes are prevalent.  Prior to her hire, Atomos' Limited's Board and Executive

Team were composed of only men, as depicted in Atomos' investor presentation on February 14,

2021:



32.    It was not until June 2021, the week before Ms. McGechie's hire as Chief Product

Officer was announced, that Atomos added two female directors, Lauren Williams, and Megan

Brownlow, for the first time in Atomos' history.

33.    Atomos is known as having a "boys' club" culture where men severely outnumber

women at all levels of the company and where women are sidelined.  Especially in leadership

positions, senior women are excluded from meetings, their expert opinions are not sought, and

women are expected to adhere to stereotypical gender roles.  When female leaders express their

opinions, they are trivialized and marginalized.

34.    Indeed, Atomos has a spotted history with its treatment of women in the

workplace that goes to the very top of the company.  Several female employees have reported

experiencing discrimination and abusive behavior.  In response to employee reports of gender

discrimination and sexual harassment, the company failed to take any remedial action and, in one

instance, terminated the employee.

FIRST AMENDED COMPLAINT FOR DAMAGES

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

35.     As one example, a former employee was sexually harassed and assaulted by a male executive on multiple occasions between 2016 and 2017.  A male colleague witnessed this abusive behavior and enviously said to the employee, "wow, you're getting so much attention."  The former employee reported these incidents of the executive forcibly trying to kiss and touch her to Tony Trent, Atomos' Chief Operating Officer at the time, and Chief Financial Officer James Cody.  Both Mr. Trent and Mr. Cody informed the harasser of the report.  In response, the harasser escalated his conduct, culminating in him physically and verbally assaulting the employee at a work event.  In front of customers and employees, he threatened that if she ever talked to anyone about his conduct, he would tell people that she came on to him.  The employee fled the event and resigned.  The incident was so disturbing that a male colleague, who had witnessed the conduct and attempted to protect the employee, also resigned.

36.     In or around April 2021, a former marketing employee filed a Victorian Equal Opportunity and Human Rights Commission[1] complaint against Atomos naming Mr. Young and Chief Operating Officer Mark Harland.  Among other claims, she alleged gender discrimination and retaliation.  The complaint alleged that Mr. Harland told her that there was no question that she was capable of doing her job, but that she had not gained the confidence of Mr. Young and other executives.  She stated that when she complained to Mr. Harland of abusive behavior by Mr. Young, he told her that she needed to take Mr. Young "out for lunch and get drunk with him."  When Ms. McGechie was sent the complaint in March 2022, she asked for an immediate remedy for the employee.  Mr. Cody's response was that the employee was "difficult."  Later, in an executive meeting, Ms. McGechie asked multiple times to remedy the complaint.  The all-male Executive Team claimed that the employee was "difficult," "useless," and that she was covering up her "poor performance."

37.     Atomos ignored these complaints.  Indeed, Atomos accepted and ratified egregious conduct by its male executives for years, which was well-known within the company and by the Board of Directors.  In addition to claims of sexual harassment of women, Atomos

---

[1] The Victorian Equal Opportunity and Human Rights Commission is the Australian state of Victoria's equivalent to the Equal Employment Opportunity Commission (EEOC) or the California Civil Rights Department (formerly Department of Fair Employment and Housing).

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

tolerated inappropriate conduct by its leadership, including drug and alcohol abuse, aggressive public outbursts, offensive public statements, and failure to disclose material information to shareholders, among other indiscretions.

38.     In February 2020, Mr. Young took a leave of absence.  However, Atomos did not publicly disclose Mr. Young's absence until May 2020.  Mr. Tait stepped in as interim CEO from March 2020 through September 2021.

39.     In July 2021, Mr. Young made headlines for being fined by police after using his yacht to travel from a then-COVID hotspot, Sydney, Australia, to the Gold Coast.  Mr. Young and his crew allegedly provided false information on their declaration cards to access the Gold Coast in violation of Australian law.  The fallout was immediate and damaging to Atomos. During this time, Atomos was considering whether and in what capacity to keep Mr. Young employed, despite his many prior transgressions.  Even after this incident, Atomos did not announce Mr. Young's retirement from his position as Co-Founder and director on the Board until November 2021, several months later.

**C.     Atomos Subjects Ms. McGechie to Gender Discrimination.**

40.     In September 2021, in recognition of her strong business record, industry experience, and valuable contributions to the company, Atomos promoted Ms. McGechie to CEO.

41.     Although she had worked amicably with the all-male Executive Team for months as a consultant and as Chief Product Officer (CPO), soon after she took on the CEO role, Ms. McGechie began receiving pushback from the Board and the all-male Executive Team, including Chief Financial Officer James Cody, Chief Technology Officer Trevor Elbourne, Chief Sales Officer Stephan Kexel, and Chief Operating Officer Mark Harland.  Their actions made it abundantly clear that they were not comfortable reporting to a powerful woman who was taking real action to right the ship.

42.     For example, under Mr. Young's leadership, Mr. Kexel had agreed to follow a process whereby he was required to obtain 100% agreement from the Executive Team, including Mr. Young, prior to finalizing a sales promotion and making it public.  Under Ms. McGechie's

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

leadership, despite her request for the same visibility and authorization, Mr. Kexel made sales promotion decisions without full executive approval, sometimes bypassing Ms. McGechie.

43.    Ms. McGechie was talked down to or treated dismissively by Board members in a manner that was in stark contrast to the treatment received by the company's male CEOs.  For example, on August 14, 2021, Ms. McGechie met with Board member Stephen Stanley.  Mr. Stanley told Ms. McGechie that she needed to be cognizant of "saying Apple too much," despite the fact that Ms. McGechie was specifically brought into the business for her experience working at Apple and other U.S. tech companies.  Mr. Stanley warned her that she was "acting like a CEO without being a CEO," that Atomos is "not Apple" and Ms. McGechie was "unproven."  Ms. McGechie was taken aback.  At the time of their conversation, Ms. McGechie was already being slotted as the next CEO and Mr. Stanley's tone with her was gendered, dismissive and condescending.

44.    On August 30, 2021, Ms. McGechie met with Mr. Stanley and Mr. Tait regarding her promotion to CEO.  Mr. Stanley advised Ms. McGechie to "resist answers" but instead to respond to the Executive Team when they raised ideas by saying, "I'll take that on board."  He told her to "take everyone on the journey, don't say it's wrong or right."  Again, Ms. McGechie found Mr. Stanley's "advice" to water down her authority to be patronizing and concerning.

45.    Often during meetings, Board members Mr. Stanley and Sir Hossein Yassaie would express, non-verbally and verbally, for Ms. McGechie to keep quiet or to only speak when she was invited to and agreed with them.  On one occasion, Sir Yassaie explicitly told her not to speak.  She was humiliatingly forced to raise her hand for twelve minutes waiting to be called on.  When she was finally acknowledged, male Board members continued to interrupt her, and she was forced to wait another fifteen minutes before she could talk.

46.    Although Ms. McGechie was ostensibly hired to implement change, she faced staunch resistance from the Board, which resulted in Atomos losing business opportunities.  For example, Ms. McGechie led two acquisitions: Acquisition "A" and Acquisition "B".  At each step, the Board questioned Ms. McGechie's actions, even explicitly telling her to stay out of the negotiations, which unnecessarily stalled these time sensitive business transactions.

47.    Ms. McGechie reported to the Board that Atomos was in jeopardy of losing Acquisition "A" due to the negotiation tactics of Board members Stanley and Yassaie, but the Board did not listen.  The Board of Acquisition "A" then recommended against the acquisition, saying that the negotiation tactics proved to them that the Atomos Board was unsupportive and harsh.  Ms. McGechie spent many hours intervening to try to save the deal.  At the time of her termination, Atomos still had not secured the transaction.

48.    Similarly, Acquisition "B" began working with other market opportunities because of the negotiation tactics employed by the Board.  Ms. McGechie authored multiple presentations and acquisition documents, authored an analysis in the Atomos video vertical, completed nearly all of the post-signing due diligence, and completed multiple tested and verified financial projections of Acquisition "B."  Even still, the Board did not credit her opinions or research.  Ultimately, Acquisition "B" pulled out of negotiations, despite Ms. McGechie's efforts.

49.    The comments and treatment Ms. McGechie received are archetypal examples of gender discrimination.  Men are encouraged to be assertive in the workplace, but assertiveness is a liability for women, even for executives.  Whereas male executives are viewed as bold, thoughtful, and engaged leaders when they challenge and critique proposed strategy decisions, female executives are viewed as uncooperative, and their opinions are challenged or ignored.  Criticism such as that which Ms. McGechie received are commonly experienced by women in tech. [2]

50.    In a one-on-one meeting with Mr. Tait around October 21, 2021, Ms. McGechie reported her concerns that the Board treated her differently than former CEO Young, expressing that she did not think that a man with her background and experience would be treated with such doubt and disrespect.  She further raised concerns with Mr. Stanley and Sir Yassaie about the sexist treatment she experienced.  Her concerns were treated dismissively, and the conduct continued until her termination.

---

[2] *See* Snyder, Kieran, *The abrasiveness trap: High-achieving men and women are described differently in reviews*. https://web.stanford.edu/dept/radiology/cgi-bin/raddiversity/wp-content/uploads/2017/12/TheAbrasivenessTrap.pdf.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

FIRST AMENDED COMPLAINT FOR DAMAGES
CASE NO. 2:22-CV-01812-TLN-DB

51.    Additionally, around March 15, 2022, Ms. McGechie raised concerns to Mr. Tait and Mr. Stanley that her compensation was less than that paid to former CEO Young and to Mr. Tait when he served as interim CEO.  She also noted that Mr. Young's employment agreement provided for 12 months of salary as severance upon separation, whereas Ms. McGechie's agreement provided for 6 months – despite the fact that they performed the same role.  Again, her concerns about unequal pay based on her gender were dismissed and ignored.

**D.    Ms. McGechie Reports Channel Stuffing, Insider Trading, and other Illegal Conduct to Atomos.**

52.    As a publicly traded company, Atomos is subject to securities and fraud laws, including prohibitions on market manipulation, making false or misleading statements, and engaging in insider trading.

53.    On information and belief, Atomos' securities are purchased and sold in the United States, including through over the counter trading.  Atomos securities are owned and traded by U.S. shareholders, including those owned by Atomos' investors, employees, and contractors.

54.    Atomos has a history of engaging in "channel stuffing" to fraudulently recognize increased sales revenue and manipulate its performance numbers.  Channel stuffing refers to the practice of inflating sales figures by forcing more products through a distribution channel than the channel is capable of selling through.  The company can then record inflated sales even when it is aware that the distributor or retailer will be unable to sell through the excess merchandise to end users.  Atomos engaged in channel stuffing to meet analyst forecasts of financial performance and maintain an artificially inflated share price.  Channel stuffing is prohibited by laws that regulate mail fraud, wire fraud, accounting fraud, and securities fraud, including Section 10(b) of the Securities and Exchange Act of 1933.

55.    Channel stuffing to meet financial or sales goals often results in downstream effects, as it did at Atomos.  In order to obtain the distributor or retailer's agreement to receive shipments of products in excess of what it could reasonably sell through, Atomos offered extreme

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    discounts on its products and agreed to other unfavorable terms.  This included allowing the

2    distributor an extended payment term or return period outside of industry standards, as well as

3    write-offs of distributor invoices.  Another consequence and indicator of channel stuffing is that

4    for the following financial period, new orders are low.  Moreover, the practice of channel stuffing

5    leads to cashflow issues and wildly fluctuating distributor demand.

6        56.    Ms. McGechie began looking into Atomos' irregular sales patterns in late 2021

7    and discovered over the course of several months that Atomos was engaging in channel stuffing

8    to manipulate sales revenue.  She was later informed that Atomos had been channel stuffing for

9    years, a practice which continued while Mr. Tait was interim CEO.

10        57.    Ms. McGechie was informed by a former Atomos Director of Business

11    Development that he witnessed unlawful behavior by executives at Atomos that was known by

12    both Mr. Tait and Mr. Cody, including channel stuffing, "extended payment terms that went well

13    beyond the quarter," and "disappearing distributor invoices/complete write offs."  He further told

14    Ms. McGechie that the Board and Executive Team were party to and aware of much of this

15    behavior.  When he raised issues about what he believed was unlawful conduct, he was told to

16    just accept it.

17        58.    Ms. McGechie discovered that in June 2021, Atomos knowingly shipped AtomX

18    CAST units (an accessory for the Ninja, a switcher, multi-view monitor and broadcast quality

19    recorder) that did not have any software installed and were, for all intents and purposes, paper

20    weights.[3]  Atomos' executives and Board members were aware that the CAST units were not

21    functional, and that the software was still under development.  Nevertheless, Atomos shipped the

22    CAST to distributors with the explicit intent to stuff the channel and record sales to achieve the

23    full year forecast for the fiscal year ending in June 2021.  As a result, the company appeared to

24    achieve its projected sales numbers in FY2020 – three months before the CAST software was

25    functional – allowing Atomos executives and Board members to receive bonuses for hitting sales

26    numbers.  Customers who purchased the non-functional product reported: "To state [the CAST]

27    _____

28        [3] https://www.cined.com/shipped-atomos-atomx-cast-units-not-working-yet-atomos-
apologizes-offers-free-accessories-to-early-buyers/.

FIRST AMENDED COMPLAINT FOR DAMAGES
CASE NO. 2:22-CV-01812-TLN-DB

were accidentally shipped is disingenuous…[Atomos] simply defrauded the customers." [4]  In fact, the CAST software was not ready until late September, months after the inoperable units had been shipped to the channel for sale to customers.

59.    Ms. McGechie also learned that in November 2020, Atomos shipped a new product, a professional color grading monitor recorder sold as the "Neon."  The company again shipped the product prematurely to record sales for FY2021 and misled shareholders about the success and traction of the Neon.

60.    The Executive Team and Board were advised against the premature launch of the Neon by the Atomos Product Team and leading industry advisors.  Prior to shipping the Neon, Atomos was aware that it had deficiencies and performance issues that were contrary to the capabilities promoted in its marketing materials.  The product packaging included false and misleading statements, including that the product had Android support (it did not) and inaccurate monitor sizes.  The Neon packaging also listed Dolby Vision, implying that it was an integrated feature; however, the company did not have legal clearance to use the Dolby Vision trademark and the Neon did not function with the full Dolby feature set advertised.  In addition to software issues, the Neon had several hardware deficiencies.

61.    However, because of the immense pressure to meet sales numbers, the Neon product was shipped with full knowledge of its failures.  Following the launch, Atomos falsely announced to shareholders that the defective Neon product had garnered "very positive" feedback from customers.

62.    On or around October 8, 2021, Mr. Kexel informed Ms. McGechie that distributors had been returning stock.  Mr. Harland also acknowledged that he was aware of – and had discussed with Mr. Kexel – merchandise that had been returned to Atomos by distributors.  This was a result of Atomos' practice of shipping inventory ahead of schedule and filling its distribution channels with far more product than they could possibly sell.

63.    Atomos knew or should have known that such conduct was unlawful.  In late 2021, with Ms. McGechie's input and support, the Senior Vice President of Sales presented a

[4] *Id.*

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

sales analysis and plan to Mr. Harland, Mr. Cody, and Mr. Elbourne that noted concerns about historical channel stuffing by Atomos.  Ms. McGechie presented the same sales analysis and plan to the Board.  The presentation included a chart of actual sales through April 2021 and stated that, as a result of channel stuffing, the sales forecast was off for subsequent periods. Additionally, the presentation provided information on channel stuffing and why it was illegal, along with a proposal to disincentivize the Sales Team from engaging in channel stuffing.

64.     However, the push to manipulate sales revenue through channel stuffing came from the very top of the company.  Atomos' executives and Board were not deterred by this report of illegal channel stuffing.  Executive Chairman Tait pushed the Executive Team to hit the sales forecast for the first half of the fiscal year ending on December 30, 2021.  In December 2021, Mr. Tait called Mr. Kexel and told him to do anything he could to meet numbers that month.  Accordingly, Mr. Kexel stuffed the channel with quantities of products that were well beyond what could be sold through.  Ms. McGechie was not aware of Mr. Tait's directive until Mr. Kexel informed her in February 2022.

65.     As an example of Mr. Kexel's commitment to hitting sales goals at any costs, Mr. Kexel caused Atomos to ship two hundred Sumo 19s, a product which retails for approximately $2,000, to a distributor in China to make sales goals for December 2021. Mr. Kexel shipped the Sumos to China in order to record revenue immediately, even though he knew or should have known that the distributor could not sell the products through to customers. Moreover, Mr. Kexel knew that there were backorders for the Sumo 19 devices in the U.S. Predictably, the Chinese distributor returned the Sumo 19s, which were then shipped to the U.S. in January 2022.  The only reason for this fraudulent transaction was to artificially hit sales numbers for December.  Ms. McGechie was not aware of the fraudulent nature of this transaction until months later.

66.     On February 10, 2022, Mr. Cody provided a report to the Board regarding "Receivables and Payables", which showed that Atomos had multiple distributor invoices ageing at 60-90 days and over 90 days.  These ageing invoices were indicative of the company's pattern of channel stuffing, including making agreements with distributors to receive a large amount of

product in return for unusually favorable payment terms. The former Director of Business Development informed Ms. McGechie that it was common for entire invoices to "fall off the register," implying that the distributor's invoice was completely written off.

67. During the same Board meeting, Mr. Kexel reported to the Board that Atomos did not expect further orders for products for the next few months because it had filled the channels so thoroughly in December 2021. Mr. Kexel later wrote to Ms. McGechie, the Board, the Executive Team, sales, and finance employees that Atomos had overstocked the channel in December with one to two times more product than the regular rate of previous months.

68. On February 15, 2022, Atomos reported its results for the first half of fiscal year 2022, ending on December 30, 2021. Atomos highlighted "record revenue of $40.9m, up 25% on pcp (previous corresponding period)."

69. By March 2022, Ms. McGechie's investigation led her to raise concerns more directly and explicitly regarding channel stuffing and potential revenue manipulation.

70. For example, following an Executive Team meeting on March 17, 2022, Ms. McGechie shared with the Board screenshots of charts showing artificially high sales around certain financial reporting dates, followed by low sales in the subsequent months. Ms. McGechie informed Board members that the data evidenced a pattern of channel stuffing, and that it must be addressed.

71. At the March 17 Executive meeting, Ms. McGechie also announced that she wanted to be transparent to shareholders about the reasons why sales were low, which would affect the previously announced sales forecast. In response, the Executive Team told Ms. McGechie that a revenue downgrade would be detrimental to the share price and asked her to meet with Executive Chairman Tait.

72. On March 20, 2022, Ms. McGechie met with Mr. Cody and an external consultant for corporate strategy and investment to draft an announcement to shareholders. The draft disclosed the company's revision of the sales forecast downward to $79 million, instead of $95 million plus. It also described the effects of channel stuffing on Atomos' sales, which resulted in slow sales in the following period.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

73.     The following day, Mr. Cody reported that Mr. Tait instructed him not to share any of those materials with the Board.  Mr. Tait then cancelled meetings he had previously set with Ms. McGechie to discuss the announcement revising the forecast.  Despite Ms. McGechie raising this material information in March 2022, no announcement was made until months later, when Atomos finally announced a revision to its forecast on May 6, 2022.  The Board and Executive Team thus intentionally withheld material, price-sensitive information from the public.

74.     On March 22, 2022, Ms. McGechie requested from Mr. Cody a full accounting of executive spending for prior years.  Ms. McGechie was aware of recent reports that executives had access to a "Director's fund" that was used for personal expenditures.  A full disclosure of these funds was never reported to shareholders or audited.  Ms. McGechie also raised the unaccounted-for funds with Board members Tait and Stanley.

75.     On several occasions in late 2021 and again after receiving an investor report on March 22, 2022, Ms. McGechie raised concerns that Executive Director Mr. Tait and Director Yassaie had engaged in insider trading by selling millions of dollars of their stock holdings while simultaneously negotiating the exit of founder and former CEO Young from the company.  Both Mr. Tait and Mr. Yassaie were aware that Mr. Young was planning to sell millions of his shares as part of his departure.  Both Mr. Tait and Mr. Yassaie sold their shares mere weeks before Mr. Young sold 7 million shares, which drove down Atomos' share price drastically.  Ms. McGechie discussed the impropriety of these transactions with Mr. Tait, who insisted that he had previously planned the sale of his shares.  However, no documentation of the plan to sell was ever provided.

**E.     Atomos Retaliates Against Ms. McGechie for Whistleblowing.**

76.     On April 10, 2022, Mr. Tait and Mr. Stanley held a meeting with Ms. McGechie and terminated her.  Ms. McGechie was shocked, as no one at Atomos had raised performance concerns with her.

77.     On April 11, 2022, Director Yassaie requested a meeting with Ms. McGechie to discuss "salvaging" the situation.  During the meeting, Ms. McGechie asked why the Board had not done any investigation or interviewed employees or external partners.  Mr. Yassaie responded

FIRST AMENDED COMPLAINT FOR DAMAGES
CASE NO. 2:22-CV-01812-TLN-DB

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

that he "trusted" the all-male Executive Team and asked why the men would mislead the Board. Ms. McGechie responded that the Executive Team did not like being asked to do work differently and they wanted to use Ms. McGechie as a scapegoat for their own conduct.  Moreover, the Board had informed Ms. McGechie at various times that it had serious performance concerns with each of the men, such that it made no logical sense that the Board would blindly trust them.

78.    That evening, Ms. McGechie spoke with Mr. Tait and Mr. Stanley.  Mr. Stanley conceded that, while he had received feedback from the Executive Team about Ms. McGechie, the four men had not provided examples and he did not have examples to share with her.  He also said that the Executive Team had not complained until recently, which made it even more unbelievable that Atomos would base Ms. McGechie's termination on these unsubstantiated complaints.  Mr. Stanley told Ms. McGechie that the termination was because of a "style and character issue."

79.    During the call, Mr. Tait stated several times that the Executives and the Board had reconsidered and wanted to "give it a second chance" to have Ms. McGechie continue at Atomos as CEO.

80.    On April 13, 2022, Ms. McGechie spoke with Mr. Tait and Mr. Stanley.  She stated that she accepted the offer to return as CEO and requested their support in resolving the issues she had raised in the past, including channel stuffing and transparency to shareholders. Ms. McGechie told them that Atomos' unlawful channel stuffing was so blatant that the market was beginning to take note.[5]  She stated that she had raised this issue multiple times and recommended that the Board request an audit.

81.    Just minutes later, after a sidebar conversation, Mr. Tait and Mr. Stanley followed up with Ms. McGechie by terminating her.

82.    On April 14, 2022, Atomos announced Ms. McGechie's termination. Contrary to what it told Ms. McGechie, Atomos stated in its public announcement that her termination was

---

[5] For example, an analyst reported on discrepancies in Atomos' financial statements noting unusual items boosting profits. *See* https://simplywall.st/stocks/au/consumer-durables/asx-ams/atomos-shares/news/we-think-that-there-are-issues-underlying-atomos-asxams-earn.

FIRST AMENDED COMPLAINT FOR DAMAGES
CASE NO. 2:22-CV-01812-TLN-DB

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

because Ms. McGechie did not relocate from California to Australia.  Ms. McGechie was hired in the middle of the pandemic while strict COVID travel restrictions were in effect in Australia. Atomos was aware of and supportive of Ms. McGechie's efforts to relocate, despite uncertainty around when the travel restrictions would be lifted.  On or around February 21, 2022, Australia lifted its strict COVID travel restrictions.  On or around March 8, 2022, Ms. McGechie signed a contract to purchase a home in Melbourne.  As part of her relocation package, Atomos wired the down payment for the home directly to the Melbourne home seller on or around March 9, 2022. When Atomos terminated Ms. McGechie's employment, Atomos was well aware of the timing and coordination of Ms. McGechie's move to Australia.  As a result of the termination Ms. McGechie was forced to exit the home purchase contract, which resulted in substantial financial loss.  Atomos' public statements regarding Ms. McGechie's termination are plainly false.

83.     The April 14 announcement contained further false and misleading statements regarding Atomos' revenue forecast.  The company stated, "Atomos reconfirms its FY22 guidance for revenue of $95m+ as well as an EBITDA margin of 12-15%."  As discussed above, Atomos was aware that low sales numbers in the first quarter of the year would affect its revenue forecasts, an issue which Ms. McGechie raised and prepared to announce to the market as early as March 17, 2022.  However, she was prevented from doing so by Mr. Tait, with the acquiescence of the Board and Executive Team.

84.     Atomos continued to knowingly make false and misleading statements regarding its revenue forecast.  On April 22, 2022, Atomos again stated that it "reconfirms its FY22 guidance for revenue of $95m+ as well as an EBITDA margin of 12-15%", the exact same revenue forecast and margin.

85.     It was not until May 6, 2022, that Atomos finally publicly disclosed that it was not projected to meet the revenue forecast and reduced the forecast for fiscal year 2022 to $80-90 million and EBITDA margin of 6-8%.  As a result, the stock tumbled over 40% in one day.  The company placed the blame for slow sales on Ms. McGechie by stating that "slower than expected sales occurred in the first four months of the 2022 calendar year" and that the cause of those problems had been "corrected mid-April."

86.    Atomos continued to repeatedly falsely denigrate Ms. McGechie to burnish its own image.  At a publicly accessible shareholder webinar held on April 14th, Mr. Tate and Mr. Elbourne falsely stated that Ms. McGechie did none of the work related to the development of the Cloud studio, and that it had been under development for two years.  In fact, Ms. McGechie was the primary leader who developed the Cloud studio and strategy, including the naming, product positioning, revenue, subscription tiers, pricing modeling, technology partnerships, marketing and launch strategy, and securing key engineering and technology resources such as Mavis.

87.    Atomos' unlawful conduct cost Ms. McGechie millions of dollars in lost earnings and other out of pocket loss, as well as non-economic damages.

## LEGAL CLAIMS

## FIRST CAUSE OF ACTION

### (Gender Discrimination: Violation of Government Code § 12940(a))

87.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 87 as though fully set forth herein.

88.    At all times herein mentioned, California's Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code §§ 12900, *et seq*., was in full force and effect and was fully binding upon Defendants.  Specifically, Section 12940(a) prohibits an employer from discriminating against an employee because of their gender.

89.    Ms. McGechie was treated less favorably than her male peers because of her gender.  The male Board members and Executive Team undermined Ms. McGechie by working around her rather than including her in important business discussions.  They made derogatory comments such as telling her to be quiet during meetings, that she should go along with what the male executives said without pushing back, that she was acting beyond her authority, that she was "unproven," and that while her skills and value to the company were not in question, she was terminated for her purported "style and character issues" in managing the all-male Executive Team.

RUDY EXELROD ZIEFF & LOWE LLP

351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

90.     While Atomos tolerated and ratified the abusive and illegal conduct perpetrated by former and current male Executives for years, Ms. McGechie, who has a strong business record and was working around the clock to turn the company around, was micromanaged, isolated, and ultimately terminated.

91.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses.

92.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to the Plaintiff's damage in an amount to be proven at the time of trial.

93.     Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## SECOND CAUSE OF ACTION

### (Retaliation: Violation of Government Code § 12940(h))

94.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 87 as though fully set forth herein.

95.     At all times herein mentioned, the FEHA was in full force and effect and was fully binding upon Defendants.  Specifically, Section 12940(h) prohibits an employer from discriminating against an employee because the person has opposed any practices forbidden under the Act.

96.     Plaintiff engaged in protected activity by reporting the sexist conduct she experienced to Mr. Tait, Mr. Stanley, and Mr. Yassaie, as well as complaining to Mr. Tait and Mr. Stanley about unequal compensation terms provided to her as compared to Atomos' male CEOs.  In response to Plaintiff's complaints, Atomos terminated her.

///

FIRST AMENDED COMPLAINT FOR DAMAGES
CASE NO. 2:22-CV-01812-TLN-DB

97.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses.

98.     As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to the Plaintiff's damage in an amount to be proven at the time of trial.

99.     Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## THIRD CAUSE OF ACTION

### (Retaliation: Violation of Labor Code § 1102.5)

100.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 87 as though fully set forth herein.

101.     At all relevant times, Defendants have been subject to the requirements of California Labor Code § 1102.5, which applied to Plaintiff as an employee of Defendants.

102.     Defendants violated section 1102.5 by abruptly terminating Plaintiff's employment in retaliation for her reports of channel stuffing, insider trading, failure to report material price sensitive information, and Defendants' intentional sale of defective merchandise.

103.     Plaintiff had a reasonable belief that Defendants were violating state and federal laws by engaging in channel stuffing, which Defendants then used to make false reports to investors in violation of Section 10(b) of the Securities and Exchange Act at 15 U.S.C. § 78j and California Civil Code sections 1572 and 1710.  Plaintiff also had a reasonable belief that Defendants violated state and federal laws by making false statements to investors regarding its revenue forecasts and failing to prevent its directors from engaging in insider trading using confidential corporate information.  Plaintiff also had a reasonable belief that Defendants violated

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1  the law by knowingly selling defective products in violation of California Business and

2  Professions Code § 17500 and California Commercial Code § 2101 *et seq*.

3      104.    As a direct, foreseeable, and proximate result of the Defendants' unlawful actions,

4  Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

5  benefits and has incurred other economic losses.

6      105.    As a direct, foreseeable, and proximate result of Defendants' unlawful actions,

7  Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to

8  the Plaintiff's damage in an amount to be proven at the time of trial.

9      106.    Defendants committed the acts herein despicably, maliciously, fraudulently, and

10 oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive

11 amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others.

12 Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to

13 proof.

14                          **FOURTH CAUSE OF ACTION**

15                  **(Wrongful Termination in Violation of Public Policy)**

16     107.    Plaintiff re-alleges and incorporates herein by reference each and every allegation

17 of paragraphs 1 through 87 as though fully set forth herein.

18     108.    Defendants' termination of Ms. McGechie employment violated the fundamental

19 public policy of the State of California embodied by the FEHA that employers shall not

20 discriminate against or harass employees on the basis of gender or retaliate against employees for

21 reporting discrimination or harassment.

22     109.    Defendants' termination of Ms. McGechie's employment also violated the

23 fundamental public policy of the State of California embodied by Labor Code section 1102.5 that

24 employers shall not retaliate against employees for reporting or objecting to what they believe is

25 illegal conduct.

26     110.    As a direct, foreseeable, and proximate result of the Defendants' unlawful actions,

27 Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment

28 benefits and has incurred other economic losses.

111.    As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, humiliation, shame, anxiety, and embarrassment, all to the Plaintiff's damage in an amount to be proven at the time of trial.

112.    Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Estelle McGechie prays for judgment and the following specific relief against Defendants as follows:

1.    For compensatory damages, including but not limited to, lost equity, lost back earnings and fringe benefits (including, but not limited to, salary and bonus wages and equity), future lost earnings and fringe benefits, emotional distress damages, and out-of-pocket loss, according to proof as allowed by law;

2.    For injunctive relief to prevent future violations of Government Code § 12940;

3.    For punitive damages as allowed by law;

4.    For prejudgment interest and post-judgment interest as allowed by law;

5.    For an award to Plaintiff of costs of suit incurred herein and reasonable attorney's fees; and

6.    For an award of such other and further relief as the Court deems just and proper.

DATED:  December 12, 2022                    Respectfully submitted,

RUDY, EXELROD, ZIEFF & LOWE, LLP

By: _____

DAVID LOWE
MICHELLE G. LEE
ZOË R. DEGEER

*Attorneys for Plaintiff*
ESTELLE MCGECHIE

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby requests trial by jury.

3   DATED:  December 12, 2022                    Respectfully submitted,

4                                               RUDY, EXELROD, ZIEFF & LOWE, LLP

5

6                                               By: _____

7                                               DAVID LOWE

8                                               MICHELLE G. LEE
                                                ZOË R. DEGEER

9                                               *Attorneys for Plaintiff*
                                                ESTELLE MCGECHIE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

27

FIRST AMENDED COMPLAINT FOR DAMAGES
CASE NO. 2:22-CV-01812-TLN-DB